IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

VELOCITY MICRO, INC.,
    Plaintiff,
    Counter-Defendant,

v.                                                         Civil Action No. 3:11-cv-473

J.A.Z. MARKETING, INC.,
    Defendant,
    Counter-Claimant,

and

JOHN HERTENSTEINER,
    Defendant.

J.A.Z. MARKETING, INC.,
    Third-Party Plaintiff,

v.

VELOCITY MICRO ELECTRONICS, INC.,
    Third-Party Defendant,

---

J.A.Z. MARKETING, INC.,
    Plaintiff,

v.                                                         Civil Action No. 3:12-cv-245

VELOCITY MICRO, INC.,

and

RANDALL P. COPELAND
    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on (1) Velocity Micro, Inc.'s motion to dismiss J.A.Z. Marketing's counterclaim, (2) Velocity Micro Electronics, Inc.'s motion to dismiss J.A.Z. Marketing's counterclaim,[1] (3) and Velocity Micro, Inc. and Randall Copeland's motion to dismiss the separate complaint filed by J.A.Z. Marketing. J.A.Z. Marketing's counterclaim and complaint overlap substantially, but the complaint, which arises from a previously independent action[2] that was subsequently consolidated with the original matter,[3] adds a couple novel claims. The Court shall address all three motions in this opinion.

The single "counterclaim" is, in fact, like a Russian nesting doll. Inside, one finds three separate "counts": one for breach of contract by Velocity Micro, the second for unjust enrichment by Velocity Micro, and the third for unjust enrichment by Velocity Micro Electronics. Under the breach of contract heading, J.A.Z. Marketing offers several theories of liability, namely, that the plaintiff breached its duty of confidentiality, failed to pay commissions owed to J.A.Z. Marketing, engaged in solicitation of employees, and committed a "breach *per se*" by failing to terminate their agreement according to the terms in their contract. The unjust enrichment count against Velocity Micro has to do with allegedly uncompensated "value added" that it accrued from J.A.Z. Marketing's sales and marketing activities. Finally, the unjust enrichment count against Velocity Micro Electronics also seeks compensation for the same "value added" to Velocity Micro through J.A.Z. Marketing's efforts.

---

[1] Velocity Micro Electronics, Inc. was not originally a party to the suit. It only became a part of the controversy upon the filing of J.A.Z. Marketing's counterclaim, thus making it a third-party defendant. Velocity Micro, Inc. and Velocity Micro Electronics, Inc. are distinct entities that are represented by separate legal counsel in this matter.
[2] *I.e.*, 3:12-cv-00245.
[3] *I.e.*, 3:11-cv-00473.

The complaint adds claims of commercial defamation and tortious interference with prospective business advantage to those put forth in the counterclaim. The parties have submitted their memoranda of law in support of their respective positions.[4] Along with their other pleadings, these materials are sufficient to permit disposition of the present motions. The Court shall accordingly dispense with oral argument since it would not aid in the decisional process.

The Court finds that the only claim able to survive a motion to dismiss is the one dealing with underpayment of commissions owed to J.A.Z. Marketing under a breach of contract theory. While denying that J.A.Z. Marketing is entitled to unpaid commissions, Velocity Micro, Inc.'s motion to dismiss actually exempts this part of the counterclaim from its attack.[5] J.A.Z. Marketing's remaining arguments, however, do not hold up to scrutiny. As a result, the Court shall grant all three motions and dismiss all claims except J.A.Z. Marketing's claim for underpayment of commissions.

## I. Statement of Facts

The parties entered an agreement on June 30, 2008, by which defendant J.A.Z. Marketing ("J.A.Z."), represented by its President, defendant John Hertensteiner ("Hertensteiner"), would provide operational, promotional, and sales and marketing services to the plaintiff, Velocity

---

[4] J.A.Z. Marketing did not submit a memorandum in opposition to Velocity Micro and Randall Copeland's motion to dismiss J.A.Z. Marketing's complaint. Thus, the only briefing on this motion is the memorandum filed in support of the motion to dismiss.

[5] "Velocity Micro strenuously denies that J.A.Z. Marketing is entitled to any further commissions under the Contract. . . . At this early stage, however, Velocity Micro . . . does not seek to dismiss J.A.Z. Marketing's contractual claim for these commissions." (VM Mem. Supp. Mot. to Dismiss Countercl. 4, n.1.)

Micro, Inc. ("VM"), a vendor of computers and computer peripherals.[6] The parties executed a five-page written contract establishing the terms and conditions of their business relationship. The contract's terms are comprehensive, and, most importantly for the Court's purposes, it clearly covers the issues in dispute, as the parties themselves agree.

The paragraphs regarding termination state:

### 7. Term and Termination

7.1. This Agreement, after twelve months from the above Agreement date, can be terminated in any Sub-Territory, for any reason, on ten days written notice, and termination to become effective thirty days thereafter. . . . Termination of this Agreement in total shall become effective thirty days from receipt of written notice as stipulated herein. Commissions shall be payable for shipments made within thirty days thereafter. This Agreement will renew automatically one year from the effective date of this Agreement first written above unless terminated by either party as stipulated herein.

7.2. In the event of termination under Paragraph 7.1 above, [J.A.Z. Marketing] shall be entitled to commissions for orders shipped by [Velocity Micro, Inc.] within a period thirty days from the effective termination date for orders accepted up to the termination effective date.

(J.A.Z. Answer Ex. A, at 2.) Thus, the contract specified the conditions under which termination of the agreement could occur. Regarding the manner for providing notice of termination, a separate paragraph reads:

10.10. **Notices.** All notices, demands, or consents required or permitted under this Agreement shall be in writing and shall be delivered by commercial courier or mailed certified return receipt requested to the respective parties at the addresses set forth above or at such other address as such party shall specify to the other in writing. Any notice required or permitted to be given by the provisions of this Agreement shall be conclusively deemed to have been received on the day it is delivered to that party by U.S. Mail with Acknowledgment of Receipt or by any commercial courier providing equivalent acknowledgment of receipt.

---

[6] Computer peripherals include monitors, keyboards, printers, mice, CPUs, data processors, modems, hard and floppy drives, tape drives, DVD drives, CD drives, and various other electronic components. (VM Compl. ¶ 8.)

(*Id.*) On Tuesday, July 5, 2011—more than three years after the contract's execution—Randall P. Copeland, President & CEO of VM, sent an email titled "Termination" and addressed to "John," as in John Hertensteiner. The most important portion of the message read, "In accordance without our contract dated June 30, 2008, which has since expired, Velocity Micro, Inc. hereby terminates our business relationship and agreements with Jaz Marketing, Inc. (Jaz), effective immediately." (VM Compl. Ex. B, at 1.). Copeland went on to say, "We will continue to make commission payments for all prior net sales as they are collected, and will continue to accrue commissions for net shipments through August 15th, 2011," provided that J.A.Z. maintained certain decorum. (*Id.*) Copeland also wrote that VM would "notify customers immediately regarding this change" and copied several other recipients on this email, including three individuals with VM email addresses and five individuals with Foxconn email addresses. (*Id.*) According to J.A.Z., Foxconn, which is not a party to this suit, was a mutual business partner to whom Hertensteiner introduced Randall Copeland. (J.A.Z. Countercl. ¶¶ 9, 11.)

Unfortunately, Copeland neglected to include a crucial email address in the list of recipients—the one belonging to Hertensteiner. Later that same day, Copeland sent a second email, which included all the previous addressees as well as Hertensteiener's email address. (J.A.Z. Answer Ex. B, at 1.) With the previous email attached, Copeland this time wrote, "I cannot believe I forgot to include you in this email I thought I sent you this morning. I apologize, and I am sorry that we have to make this change. *A letter version was also sent to you today for delivery tomorrow.*" (*Id.* (emphasis added).) J.A.Z. and Hertensteiner now claim that they never received the letter notice of termination, as the email indicated they would. (J.A.Z. Countercl. ¶ 23.)

VM brought suit later that month alleging that J.A.Z. and Hertensteiner had injured its reputation among customers through a series of false statements and accusations. J.A.Z. and Hertensteiner eventually counterclaimed, making the various arguments against VM and VME sketched out above. J.AZ. also filed a complaint in Minnesota state court, which was first removed to federal court, then transferred to this district, and finally consolidated with the initial matter. The three motions to dismiss ensued.

## II. Standard of Review

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of a claim and "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). When considering a motion to dismiss, the Court must accept all the complainant's factual allegations as true and resolve factual differences in that party's favor. *See De Sole v. United States*, 947 F.2d 1169, 1171 (4th Cir. 1991). Nevertheless, the Court need not accept the complainant's legal conclusions or any other unreasonable or unwarranted arguments as true. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008); *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). In addition, the complainant must offer more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" to overcome a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007)); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255–56 (4th Cir. 2009).

The complaint instead "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A complaint containing facts that are merely "consistent with" a defendant's liability

"stops short of the line between possibility and plausibility of 'entitle[ment] to relief.'" *Twombly*, 550 U.S. at 557. A claim thus becomes "facially plausible" when the complainant offers "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . [O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 678-79. Assessing whether a claim achieves plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### III. Discussion

The Court has done its best to parse J.A.Z.'s pleadings into distinct claims. All of the challenged claims fail to meet the *Iqbal-Twombly* standard and therefore require dismissal.

#### A. *Breach of Contract Claims*

##### i. *Duty of Confidentiality under the Parties' Contract*

J.A.Z. claims that VM breached its contractual duty of confidentiality "by notifying other parties in the consumer electronics community prior to terminating the relationship." (J.A.Z. Countercl. ¶ 28.) This argument falls clearly below the plausibility standard required under *Iqbal*. For one, the only portion of the contract dealing with disclosure of confidential information is Paragraph 8, and a plain reading of this language would in no way prevent either party from informing third-parties that it has terminated its relationship with the other. The paragraph states:

> 8. **Proprietary Information.** The customers, business, products/services, technology, business connections, customer lists, procedures, operations, techniques and other aspects of the business of [J.A.Z. Marketing] and [Velocity Micro, Inc.] are established at great expense and protected as confidential information and trade secrets and provide the other with a substantial competitive advantage of selling its products/services. The parties shall have access to, and be entrusted with, trade secrets, confidential information and proprietary information, and the parties would suffer great loss and injury if the either

7

party [sic] would disclose this information or use it to compete or bypass the other. Consequently, the parties agree that during its relationship with the other, and from then on, it will not directly or indirectly, either individually or as an employee, agent, partner, shareholder, or in any other capacity, use or disclose, or cause to be used or disclosed, any trade secret, confidential information or proprietary information acquired by either party during its relationship with the other.

(J.A.Z. Answer Ex. A at 3.) In short, the contract says nothing about notifying other parties of contract termination. To support its argument, J.A.Z. appears to suggest that such notification constituted a breach of confidentiality with respect to "customer and customer lists," that it "damage[d]" JAZ's relationship with its clients," and that the plaintiff may have "obtained the [recipients'] contact information . . . through confidential business materials." J.A.Z. cannot seriously maintain, however, that VM was legally unable to inform its own customers that their relationship had come to an end. Moreover, given that J.A.Z. was engaged "to manage, promote, market and sell [VM's] products/services in the United States," (*Id.* at 1), it makes little sense to argue that VM breached the parties' confidentiality agreement by using its own customers' email addresses to contact them. As VM points out, "if J.A.Z Marketing's position were legally actionable, Velocity Micro would be precluded from ever mentioning the termination to anyone, leaving all third parties that conducted business with Velocity Micro and J.A.Z. Marketing completely uninformed about the change in representation." (VM Mem. Supp. Mot. to Dismiss Countercl. 7–8.) In short, the argument that VM breached its duty of confidentiality by telling customers that it was no longer in a business relationship with J.A.Z. is simply untenable. This conclusion, furthermore, is unaffected by whether VM adhered to the notice procedure dictated by Paragraph 10.10. *See* Section I, *supra*. Either way, the communications with which J.A.Z. takes issue cannot legally be understood as a breach of confidentiality. These allegations are not even "consistent with" a theory of liability and thus fall short of the line of "possibility," let alone "plausibility of entitle[ment] to relief." *Twombly*, 550 U.S. at 557 (citations omitted).

*ii.  Contract Breach "Per Se"*

J.A.Z. next argues that "VM notified executives of Foxconn, amongst others in the industry, that it would no longer honor the Agreement. VM did so without sending appropriate termination to JAZ. Public notice of renunciation without legal termination is a breach *per se*." (J.A.Z. Countercl. ¶ 27.) This argument also goes nowhere. Even if the way that VM ended the parties' relationship constituted a breach rather than a proper termination according to the contract's terms, it would only entitle J.A.Z. Marketing to damages for the commissions that it fairly deserved for its performance up to that point in time (or potentially for a specified period of time thereafter, as Paragraphs 7.1 and 7.2 appear to contemplate). As stated earlier, VM does not challenge J.A.Z.'s counterclaim insofar as it seeks unpaid commissions. J.A.Z may consequently pursue those commissions without tacking on some legally tenuous claim of "breach *per se*." In sum, J.A.Z fails to state a claim upon which relief can be granted when it argues that VM's termination announcement was a breach *per se*.

*iii.  Solicitation of Employees*

J.A.Z. also argues in passing that VM's "attempt to contact employees in violation of a contract is a violation of Paragraph 11." (J.A.Z. Mem. Opp. VM Mot. to Dismiss Countercl. 4.) Paragraph 11 of the agreement, however, covers solicitation of the other party's employees for the purpose of "displacing or replacing [J.A.Z.] in . . . [the] Marketing Area as defined in the contract." (J.A.Z. Answer Ex. A, at 5.) Even J.A.Z. does not allege that VM attempted to "displac[e] or replac[e]" it when VM informed customers that the relationship between the two was over. More importantly, there is no reason to believe that VM contacted any "employee" or

9

"Sub Reps" of J.A.Z.—only its own customers.[7] This claim must also be dismissed for failure to meet the *Iqbal* plausibility standard.

### iv. Contract Claim from Complaint

In its complaint, initially filed in Minnesota, J.A.Z. makes yet another breach of contract claim. While apparently duplicative of the counterclaim, this contract claim is predicated on Minnesota law, rather than Virginia law. (Compl. ¶¶ 23–25, 36–37 ("JAZ has standing to assert claims for relief under Minnesota law.").) The parties unambiguously agreed, however, that their contract would be governed by Virginia law. (J.A.Z. Answer Ex. A, at 4.) J.A.Z., in fact, described this contract as "valid and enforceable" in its counterclaim. (J.A.Z. Countercl. ¶ 26) If J.A.Z. argues in one pleading that its contract is binding under Virginia law, then it may not assert in another pleading that it is also entitled to relief under Minnesota law for the very same legal claims. Accordingly, its claim for breach of contract under Minnesota law is dismissed.

### B. *Unjust Enrichment by Velocity Micro, Inc.*

J.A.Z. next argues that it is "entitled to recover for the value added to VM" under a theory of *quantum meruit* for the sales that VM enjoyed in the second half of 2011 due to J.A.Z. employees' "thousands of hours [spent] in the first half of 2011 marketing VM products and arranging sales." (J.A.Z. Countercl. ¶¶ 36–39.) In response, VM argues that this claim must be dismissed on legal grounds, namely, that the existence of an express contract governing a dispute precludes a party from seeking relief on equitable grounds for the same alleged wrongdoing. (VM Mem. Supp. Mot. to Dismiss Countercl. 9–11). This principle is well established in Virginia law. *See, e.g., Carolina Conduit Sys. v. MasTec N. Am., Inc.*, 2011 U.S. Dist. LEXIS 122578, at *8 (E.D. Va. Oct. 24, 2011) ("Where a contract governs the relationship of the

---

[7] Interestingly, J.A.Z. makes no attempt to reconcile its claim that VM contacted "employees," (J.A.Z. Mem. Opp. VM Mot. to Dismiss Countercl. 4), with its earlier claim that VM improperly contacted "mutual business contacts" or "clients" (*Id.* 3–4).

10

parties, the equitable remedy of restitution grounded in quasi-contract or unjust enrichment does not lie.") (quoting *WRH Mortgage, Inc. v. SAS Assocs.*, 214 F.3d 528, 534 (4th Cir. 2000)). In short, governing law dictates that J.A.Z.'s equitable claim against VM be dismissed.[8]

It is critical to note that although J.A.Z. is permitted to plead alternative theories of recovery, here, it has argued in its pleadings that the contract is "valid and enforceable," (J.A.Z. Countercl. ¶ 26), and that it in fact covers VM's alleged conduct. Consequently, J.A.Z. is precluded from raising any equitable claims against VM.[9] Again, this conclusion in no way prevents J.A.Z. from arguing that it is entitled to unpaid commissions. If VM has breached their agreement, then damages accounting for unpaid commissions—not uncompensated "value added"—are precisely what J.A.Z. is owed.

### C. *Commercial Defamation by Velocity Micro, Inc.*

In its complaint, J.A.Z. alleges that VM is liable for commercial defamation, in an amount to be shown at trial. Under Virginia law, in multi-state tort actions, commercial defamation is controlled by the law of the state in which the tort occurred, *Jones v. R.S. Jones and Assocs., Inc.*, 431 S.E.2d 33, 34 (1993), that is the say, specifically where the defamatory writing was first published. *See Lapkoff v. Wilks*, 969 F.2d 78, 81 (4th Cir. 1992) (applying Virginia law). When the alleged defamation is executed via email correspondence, the place of

---

[8] J.A.Z. offers only a self-defeating argument in response. It writes, "JAZ concedes to Plaintiff's argument that unjust enrichment can not supplant the terms of a written contract. However, in this case the contract is silent regarding remedy, and silent regarding behavior in the face of an ongoing renunciation of the contract." (J.A.Z. Mem. Opp. VM Mot. to Dismiss Countercl. 4). In the event of contract breach, however, hornbook law says that money damages are the appropriate remedy. And it is furthermore clear from basic contract principles that a party may not continue to perform in the face of contract renunciation in order to amass greater damages. *Forbes v. Rapp*, 611 S.E.2d 592, 595 (Va. 2005); *Haywood v. Massie*, 49 S.E.2d 281, 284 (Va. 1948); Restatement (Second) of Contracts § 350 (1981). In other words, the Court need not resort to equitable remedies in order to resolve these basic issues resulting from an alleged contract breach.

[9] This holding applies equally to the unjust enrichment claim made in J.A.Z.'s complaint.

11

publication is dictated by the place where the email was opened and read. *Galustian v. Peter*, 561 F. Supp. 2d 559, 565 (E.D. Va. 2008), *rev'd in part on other grounds*, 591 F.3d 724 (4th Cir. 2010). The application of this rule, however, is not entirely clear given that the relevant email was dispersed to various parties in different locations.

J.A.Z. has not alleged with specificity where the email was opened and read, though it is probable that, as a Minnesota corporation, it occurred in Minnesota. Furthermore, the Restatement (Second), Conflict of Laws, adopts the law of the state with the most significant relationship to the occurrence and the state where the allegedly defamed corporation has its principal place of business at the time. Restatement (Second) Conflict of Laws, § 150 cmts. a, c (1971). As J.A.Z. Marketing has not pled for the adoption of another state's defamation laws, this court applies the relevant Minnesota law governing defamation.

Under Minnesota law, a defamation claim requires that a statement be (1) false; (2) communicated to a third party; and (3) one which tends to harm the plaintiff's reputation. *Sherman v. Rinchem Co.*, 2011 U.S. Dist. LEXIS 87663, at *17–18 (D. Minn. Aug. 8, 2011). Defamatory statements must "tend to harm the plaintiff's reputation . . . in the estimation of the community," *Lewis v. Equitable Life Assurance Soc'y*, 389 N.W.2d 876, 886 (Minn. 1986), and "statements of opinion" are not actionable grounds for defamation, as they are protected speech under the First Amendment. *See, e.g., Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir. 1986). J.A.Z. supports its defamation claim with VM's email announcing the termination of its agreement, which, it says, creates an "implication . . . of misconduct or critical non-performance of . . . duties . . . thereby damaging JAZ's business reputation." (Compl. ¶ 14.) But the email, which contained absolutely no false statements, was decidedly not defamatory in character. J.A.Z. dreams up a number of negative "state[ments]" and "implications" supposedly found in

the email. (Compl. ¶¶ 16–17.) This handiwork is nothing more than the sign of a party angry about the loss of business and looking for a scapegoat. As with previous claims, the defamation claim fails to meet the *Iqbal* plausibility standard and must be dismissed.

### D. *Tortious Interference with Prospective Economic Advantage by Velocity Micro, Inc.*

For the reasons discussed in the previous subsection, and because the injury J.A.Z. alleges was suffered in Minnesota, Minnesota law controls for the tortious interference claim. *See Rahmani v. Resorts Int'l. Hotel, Inc.*, 20 F. Supp. 2d 932, 937 (E.D. Va. 1998). To recover for tortious interference of prospective economic relations, Minnesota law requires a plaintiff to establish, among other things, "the defendant's wrongful interference with that expectation." *Daum v. Planit Solutions, Inc.*, 619 F. Supp. 2d 652, 658 (D. Minn. 2009).

J.A.Z. cannot show that VM did anything *wrongful* to disrupt its business relationships. Tortious interference requires an act that is "independently wrongful such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade or any other wrongful act recognized by statute or the common law." *Harman v. Heartland Food Co.*, 614 N.W.2d 236, 241 (Minn. Ct. App. 2000) (quoting *Birdsong v. Bydalek*, 953 S.W.2d 103, 112-13 (Mo. Ct. App. 1997)). J.A.Z. has raised no tort claim other than defamation, which clearly requires dismissal. As such, any interference caused by VM's termination email cannot be considered wrongful. The claim is accordingly dismissed.

### E. *Unjust Enrichment by Velocity Micro Electronics, Inc.*

In its counterclaim, J.A.Z. argues that it is entitled to compensation from *VME* for the value added to *VM* under a theory of quantum meruit. (J.A.Z. Countercl. ¶ 47.) Indeed, this paragraph in the complaint is identical to the paragraph in which it demands compensation from VM for unjust enrichment, except that it has substituted one company's name for the other. (*Id.* ¶¶ 39, 47.) The basis for J.A.Z.'s unjust enrichment claim against VME is an "oral agreement"

that the parties supposedly formed in conjunction with executives from Foxconn. (*Id.* ¶¶ 16, 17.) According to this agreement, J.A.Z. would continue performing "the same work" required by the VM contract but payments "would be made [to J.A.Z.] from Foxconn, on behalf of VME," rather than "from Foxconn to VM . . . to JAZ." (*Id.* ¶¶ 15, 16.)

This "oral agreement," as J.AZ. concedes, was in fact a written agreement that was proposed in February 2011 but never actually executed. (*Id.* ¶ 17.) J.A.Z. argues that Hertensteiner, "[b]elieving that the offer of contract was adequate as an oral agreement, . . . did not execute the contract offered by Foxconn and VME." (*Id.*) J.A.Z. now claims to be entitled to compensation for the value added to VM because, despite not having finalized the contract, it "continued to perform the work specified in the contract." (*Id.*)

There are several obvious flaws with J.A.Z.'s position. First of all, the non-executed written agreement that J.A.Z. considers "adequate" to prove the existence of an oral contract contains spaces where the parties were clearly supposed to sign. (*Id.* Ex. B, at 8.) The evident need for signatures is only reinforced by the email in which the contract was attached, where the Foxconn representative writes, "Dear John, . . . Please see attached contact [*sic*] between VME and JAZ and *sign them* [sic] *soon.* [W]e will pay 2.5% commission to you (JAZ) directly from March." (*Id.* Ex. B, at 1.) Thus, the lack of a signed instrument is evidence not of an adequate oral agreement but rather an offer that was rejected, if only through inaction.

Of course, J.A.Z. need not prove the existence of any agreement to bring an unjust enrichment claim, for unjust enrichment deals with performance in the *absence* of a contract. *See* Section III.B., *supra.* The problem for J.A.Z., however, is that the rejected agreement and J.A.Z.'s own pleadings collectively establish the continued effect of the J.A.Z.-VM agreement. J.A.Z.'s performance was thus not performance for *VME*'s benefit but rather performance under

the VM contract for *VM*'s benefit. As a result, J.A.Z. cannot claim unjust enrichment by VME any more than it can claim unjust enrichment by VM.

Even after VME allegedly "induced [J.A.Z.] to continue working by offering a contract and allowing [J.A.Z.] to labor under the assumption an 'oral contract' had been created," (J.A.Z. Mem. Opp. VME Mot. to Dismiss Countercl. 3), J.A.Z., by its own admission, did not receive payments from Foxconn or VME, but instead continued to receive commissions directly from VM. (J.A.Z. Countercl. ¶ 19.) J.A.Z. also never sent any invoices to VME, as it was obligated to do by the "oral contract." (VME Mem. Supp. Mot. to Dismiss Countercl. 3.) Furthermore, J.A.Z. itself contends that its contract with VM remained "valid and enforceable" until the July 2011 termination email was sent. (*Id.* ¶¶ 20, 26.) In short, the notion that J.A.Z. had been duped into working for VME is simply implausible when it continued to work for and get paid by VM, not VME.

Ultimately, J.A.Z.'s own pleadings are its undoing, because they only confirm that it did nothing for VME's benefit but only to satisfy its contractual obligations to VM. This simple fact prevents it from establishing any of the necessary elements of an unjust enrichment claim. To state a cause of action for unjust enrichment, J.A.Z. must allege that: (1) it conferred a benefit on VME; (2) VME knew of the benefit and should reasonably have expected to repay J.A.Z.; and (3) VME accepted or retained the benefit without paying for its value. *See Schmidt v. Household Finance Corp., II*, 276 Va. 108, 116 (2008); *F.D.I.C. v. S.A.S. Assocs.*, 44 F. Supp. 2d 781, 787 (E.D. Va. 1999), *aff'd*, 214 F.3d 528 (4th Cir. 2000). Without showing that it conferred on a benefit on VME independent of what it did for VM, the claim simply fails.

\* \* \*

In the end, the Court finds that none of J.A.Z.'s claims against VM can survive a motion to dismiss under the *Iqbal-Twombly* standard, except for its claim to unpaid commissions. Likewise, its unjust enrichment claim against VME cannot go forward because it cannot plausibly allege that any of the elements of an unjust enrichment claim have been satisfied.

### VI. Conclusion

For the reasons set forth above, the Court shall grant the three motions to dismiss—the first filed by Velocity Micro, Inc., the second filed by Velocity Micro, Inc. and Randall Copeland, collectively, and the third filed by Velocity Micro Electronics, Inc.

The Court will enter an appropriate order.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Date: July 23, 2012
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge