IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

VELOCITY MICRO, INC.,
    Plaintiff,
    Counter-Defendant,

v.

JAZ MARKETING, INC.,
    Defendant,
    Counter-Claimant,

and

JOHN HERTENSTEINER,
    Defendant.

Civil Action No. 3:11-cv-473

JAZ MARKETING, INC.,
    Third-Party Plaintiff,

v.

VELOCITY MICRO ELECTRONICS, INC.,
    Third-Party Defendant,

---

JAZ MARKETING, INC.,
    Plaintiff,

v.

VELOCITY MICRO, INC.,

and

RANDALL P. COPELAND
    Defendants.

Civil Action No. 3:12-cv-245

# MEMORANDUM OPINION

This matter is before the Court on the parties' cross-motions for summary judgment. The plaintiff, Velocity Micro, Inc. ("VM"), has brought six claims against defendants JAZ Marketing, Inc. ("JAZ") and John Hertensteiner, the president of JAZ Marketing. These claims are tortious interference with prospective business advantage (Count I), defamation (Count II), breach of contract due to disclosure of confidential information (Count III), breach of contract due to overpayment of commissions (Count IV), federal trademark infringement (Count V), and common law trademark infringement (Count VI). The defendants have counterclaimed, alleging that VM actually owes unpaid commissions to JAZ.[1]

The plaintiff seeks a money judgment on Count IV, alleging overpayment of commissions. On the remaining counts, it seeks an injunction to stop the defendants' allegedly wrongful business practices. The plaintiff also seeks compensatory and punitive damages on all counts. At this time, they ask the Court to grant summary judgment, awarding damages for Count IV and injunctive relief on the remaining counts. In turn, the defendants have moved for summary judgment awarding them unpaid sales commissions. The defendants also ask for summary judgment dismissing all the plaintiff's claims.

The Court denies the plaintiff's motion for summary judgment. The Court grants the defendants' motion for summary judgment in part and denies it in part.

As to Counts III and IV of the complaint and the counterclaim, material questions remain which require a jury trial. With respect to Count III, VM's contractual claim related to

---

[1] JAZ and Hertensteiner previously made additional claims against VM and its president, Randall Copeland, but the only claim to survive until now is the one for underpaid commissions. The contract between VM and JAZ does not, however, implicate Randall Copeland, for the two companies alone were parties to the contract. Thus, Copeland shall be dismissed as a party to this action. All claims against Velocity Micro Electronics, Inc. were previously dismissed, so that company (which is formally separate from Velocity Micro, Inc.) is no longer a party to this litigation either.

disclosure of "confidential" information in violation of the contract, jury questions exist as to whether the defendant disclosed confidential matter and, if so, whether the plaintiff suffered any harm from the leaked information. In Count IV and the counterclaim, VM and JAZ request judgment related, respectively, to the over- and underpayment of sales commissions. Neither party has sufficiently proved its entitlement or the amount of its claim, so the Court cannot grant summary judgment.

As to the remaining claims in the complaint, the Court denies summary judgment for VM but grants it for JAZ. Count I, claiming tortious interference with business expectancy, fails, for lack of proof of a viable expectancy. Count II, asserting commercial defamation, fails because the allegedly defamatory statements are either (a) privileged statements by an attorney, (b) opinion, (c) not demonstrably false statements, or (d) private communications directly between the litigants. As to Counts V and VI, claiming trademark infringement and unfair competition, VM cannot show that JAZ used any of VM's brand names in a manner likely to create confusion about whose products were being sold and marketed. Finally, VM has not yet prevailed on any of its theories, so the Court will not enter an injunction at this time.

## I. BACKGROUND

Velocity Micro, Inc., is a Virginia corporation and a vendor of computers and computer peripherals. Defendant J.A.Z. Marketing, Inc., is a Minnesota corporation that provides promotional and marketing services. Defendant John Hertensteiner, a resident of Minnesota, is the president and founder of JAZ. On June 30, 2008, JAZ and VM entered into a contract wherein JAZ would provide operational, promotional, and sales and marketing services to VM and would receive sales commissions in return. Specifically, under this contract, JAZ sold VM's products to retail stores. The termination of this agreement and the defendants' subsequent response bring the parties to court.

Paragraph 4 of the contract, entitled "Commission," establishes the terms of compensation: "[VM] shall pay [JAZ] a commission rate of 2.5% of the *final net collected invoice amount after all allowable deductions, discounts, or rebate accruals*, for all products sold to approved accounts, and approved purchase orders for immediate delivery, pursuant to Exhibit A." (Pl.'s Mem. Supp. Summ. J., Ex. B (emphasis added).) Neither the contract itself nor the parties' briefs say anything more about the existence or content of Exhibit A.

The contract also specifies the conditions under which termination of the agreement could occur and how commissions would be handled thereafter:

> 7. Term and Termination
>
> 7.1. This Agreement, after twelve months from the above Agreement date, can be terminated in any Sub-Territory, for any reason, on ten days written notice, and termination to become effective thirty days thereafter. . . . Termination of this Agreement in total shall become effective thirty days from receipt of written notice as stipulated herein. Commissions shall be payable for shipments made within thirty days thereafter. This Agreement will renew automatically one year from the effective date of this Agreement first written above unless terminated by either party as stipulated herein.
>
> 7.2. In the event of termination under Paragraph 7.1 above, [JAZ] shall be entitled to commissions for orders shipped by [VM] within a period thirty days from the effective termination date for orders accepted up to the termination effective date.

VM terminated the contract by written notice, pursuant to the Terms of Termination, on July 6, 2011.[2] Randall Copeland, President and CEO of VM, first notified Hertensteiner of the termination by email on July 5, 2011. He wrote that VM would "continue to make commission payments for all prior net sales as they are collected, and will continue to accrue commissions for net shipments through August 15th, 2011. . . ." (*Id.*, Ex. C.) This offer appears to contradict the terms of the contract, which says that termination would not become effective until thirty days

---

[2] Earlier in this litigation, JAZ disputed the validity of the termination, claiming that it never received written notice of the termination. VM, however, has provided confirmation of a delivery to Hertensteiner on July 6, 2011, which was signed Hertensteiner himself. (Pl.'s Mem. Supp. Summ. J., Ex. D.) Thus, the Court finds that VM properly terminated the contract.

after receipt of written notice and that commissions would be payable for thirty days thereafter.[3] In any event, the parties agree that commissions were supposed to be paid for shipments through August 15, 2011.

In the following months, VM paid JAZ commissions for inventory sold, including a $70,000 payment in September 2011. After making these payments, however, VM claims that it received a large number of returns. VM says that this returned inventory was sold by JAZ and should be deducted from JAZ's commissions. According to VM, the returns resulted in $47,790.23 in overpayment.

After receiving VM's email terminating the contract, John Hertensteiner engaged in various actions that led to the plaintiff's claims for tortious interference, defamation, breach of confidentiality under their contract, and trademark infringement. These actions include: (1) writing an email on July 19, 2011 to retailers discussing the nature of the relationship between VM, Velocity Micro Electronics, Inc. (VME), and Foxconn, a mutual business associate (*Id.*, Ex. J); (2) sharing emails, text messages, and other communications with Gilbert Wu and other Foxconn executives (*Id.*, Exs. E, G; *see also* Pl.'s Notice of Supplemental Evidence (Dk. No. 59).); (3) a July 7, 2011, letter from JAZ's lawyer demanding a settlement of the dispute between the companies (Pl.'s Mem. Supp. Summ. J., Ex. H.); and (4) emails sent to a retailer by Jay Lerner, a JAZ sub-representative and agent. (*Id.*, Ex. I; Joint Stipulations ¶ 20 (Dk. No. 72).)

The relationship between JAZ, VM, VME, and Foxconn is itself a complex subject. From the beginning, VM has taken the position that it and VME are separate entities and that each party to this litigation has to answer for itself. Recently, however, the parties stipulated that "Velocity Micro was the exclusive sales representative in the United States for an affiliated but separate company, Velocity Micro Electronics, Inc. ("VME"), which manufactures and

---

[3] Furthermore, it is unclear whether "thereafter" refers to receipt of written notice or the effective termination date, which is thirty days after receipt of written notice.

assembles computers and computer peripherals for sale throughout the world, including CRUZ tablet computers." (Joint Stipulations ¶ 6.) This statement begins to tell the story but also leaves a great deal unexplained. In early 2011, JAZ and VME discussed a contract similar to the one between JAZ and VM in 2008, except that it would have made JAZ a direct sales representative of VME. (Countercl., Ex. B (Dk. No. 14).) This contract, which was never executed, would have cut VM out of the picture altogether. But, in reality, VM and VME are closely enmeshed. Randall Copeland holds an executive position in both entities. He serves not only as president of VM, but also as a director of VME.[4] Both entities share the same principal office address in Richmond, Virginia. In addition, Copeland has testified that VME has a right to the VM name through a license agreement between the two parties. (Copeland Deposition 10–11 (Defs' Mem. Opp. Summ. J., Ex. D).) In short, though the two companies may be legally distinct entities, they are not entirely independent in a practical sense.

Foxconn is, in principle, yet another distinct business entity. But during the recent hearing on the parties' cross-motions, counsel for VM stated, "VME was, for all intents and purposes, Foxconn." He added that VME was "just a shell" for Foxconn, through which Foxconn sold goods to VM and received payments. Indeed, multiple VME executives serve Foxconn as well. Both Benjamin Cheng and "Lisa" Y.X. (Yi-Hsun) Oh, who were copied on the July 2011 termination email and have Foxconn email addresses, are also listed as VME officers (in addition to Copeland). (*See* Pl.'s Mem. Supp. Summ. J., Ex. C; Defs' Mem. Opp. Summ. J., Ex. A.) These Foxconn employees were not simply third parties but were instead integral to the creation and the substance of the VM-JAZ relationship.

The payment structure for the contract between VM and JAZ shows that VM, other than providing the rights to the Velocity Micro and CRUZ brand names, actually had a minor role in

---

[4] The Virginia State Corporation Commission lists Copeland as a director of VME on its website. (*See* Defs' Mem. Opp. Summ. J., Ex. A.)

6

what was largely a relationship between Foxconn (*i.e.*, VME) and JAZ (Branch Deposition 11–13 (Defs' Mem. Opp. Summ. J., Ex. F).) According to Patteson Branch, VM's Vice President of Finance and Business, when JAZ completed sales, *VME* was the party that received payments, and VM would then receive 5% of those sales as a "licensing" fee, presumably in exchange for the use of its trademarked names. (*Id.*) VME made these payments by wiring money to VM, which would in turn pay JAZ its 2.5% commission for sales and marketing. (*Id.*) Prior to this arrangement, VM had actually never sold or distributed tablet computers such as the CRUZ brand. (*Id.* 10.) Although VM owns the CRUZ trademark, VME actually manufactured and assembled the CRUZ tablet computers for JAZ to market and sell to retailers, and, in turn, VME received the lion's share of the income from sales. (Joint Stipulations ¶¶ 5–6.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the movant establishes that there is no genuine dispute of any material fact and is thereby entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). After an adequate period of time for discovery, Rule 56(a) mandates a grant of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Fed. R. Civ. P. 56(a). The court resolves all genuine factual disputes and inferences in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*).

Once the movant satisfies its showing for summary judgment, the burden shifts to the non-moving party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88 (1986). The non-movant may not rest on claims within its pleading, but "must come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587 (internal quotation marks & emphasis omitted); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

### III. DISCUSSION

#### A. Commission Payments for Returned Products (Count IV)

The Court denies both parties' motions summary judgment on VM's claim to $47,790.23 in commission refunds. Though VM may well be contractually entitled to a refund for returned inventory (Joint Stipulations ¶ 11), the proof offered for its claim is insufficient for summary judgment. VM offers little more than "credit memos" mostly dated March 5, 2012—well after the commencement of litigation—and claims that these documents show returns by retailers to which JAZ had been selling goods prior to August 15, 2011. (Pl.'s Mem. Supp. Summ. J., Ex. L.) These credit memos basically present the name of a retailer and a total figure owed. There are no signatures demonstrating acceptance on any of these documents, nor can VM show that this sort of document was part of the companies' business practices prior to termination. In fact, VM did not have the means of determining when returned inventory was originally purchased by a retailer and therefore could not determine if it was sold before or after August 15, 2011. (Branch Deposition 65–67.) VM attempts to bolster these records through Copeland and Branch's depositions. But these depositions only speak to the practice of deducting commissions for refunds, not to the amount of any overpayment of commissions. Even though JAZ concedes that returned products were credited against commissions, JAZ correctly argues that VM has not properly attributed any returns to JAZ.

The VM-VME accounting system for sales and returns was rife with inconsistency and confusion. Even though VM shipped goods directly to retailers and received returned goods directly from retailers, it did not handle payments directly with retailers. (Branch Deposition 13–21.) In order to get what it was owed, VM invoiced VME based on what it recorded in shipments and returns. (*Id.* 13, 20.) When wire transfers were sent from VME to VM, there was no accompanying statement of what the payment was for. "Very often," Branch stated, "we would have to send clarifying documents to them to try to clarify exactly what they were paying." (*Id.* 16.) Furthermore, VME did not even separately account for returns in its wire transfers to VM. According to VM, VME simply deducted returns from its new licensing fee payments. (*Id.* 16–17.) This payment system "often" led to "considerable problems reconciling accounts" between VM and VME. (Copeland Deposition 25–26, 52.) VM "would not be sure who got what products, when they got them, what the real balance was." (*Id.* 25.) VM would find out about these problems when "[t]he retailer would say: We don't owe you the amount that you say we owe you." (*Id.* 26.) When asked how long it would take to resolve these problems, Copeland responded, "Sometimes a few weeks. Sometimes a few months. *Some never got resolved.*" (*Id.* 52 (emphasis added).) JAZ received its commission payments only after this reconciliation took place. (*Id.*) In short, even though VM supposedly maintained and sent its own invoices for sales and returns to VME (which have not been produced), the companies were often unable to keep track of who got what products and when.

By the same token, JAZ has not established whether it is owed anything and, if so, how much. This failure of proof may stem from VM's accounting problems. Regardless, JAZ is not entitled to summary judgment on its counterclaim for unpaid commissions. Since material factual issues remain unresolved regarding commissions, the parties' motions for summary judgment are denied.

### B. Tortious Interference with Prospective Economic Advantage (Count I)

VM alleges that the defendants were responsible for two entities—Foxconn and Office Maxx—discontinuing their business negotiations with VM subsequent to the defendants' improper communications. But VM offers little proof of any prospective business relationship with either party, and it certainly does not show that JAZ was the cause of these relationships' failure to bear fruit. Thus, the Court grants summary judgment to the defendants on VM's tortious interference claim.

To state a claim for tortious interference with prospective economic advantage, a plaintiff must:

> (1) demonstrate the existence of a business relationship or expectancy, with a probability of future economic benefit; (2) demonstrate knowledge of the relationship or expectancy; (3) show that it was reasonably certain absent intentional misconduct, the claimant would have continued in the relationship or realized the expectancy; (4) show that it suffered damages from the interference; and (5) show that the defendant employed improper means to interfere with the prospective advantage.

*Shirvinski v. U.S. Coast Guard*, 2010 WL 4279254, at *6 (E.D. Va. Oct. 25, 2010) (quoting *Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001)).[5]

VM never had a contractual relationship with Office Maxx. The two businesses negotiated terms for a possible deal, but never reached a formal agreement. Similarly, VM never achieved a formal contractual relationship with Foxconn. VM claims that JAZ's communications with these companies caused them to cut off negotiations with VM. (*Id.*, Ex. E–H.) As to causation, VM simply states that, absent Hertensteiner's communications, it is "aware of no other reason why" these relationships failed to go forward. (Pl.'s Mot. Summ. J.

---

[5] At one point in this litigation, the parties engaged in discussion about whether to apply Virginia or Minnesota law to the common law claims (tortious inference, defamation, and trademark infringement). They now agree that the states' laws are substantively the same, so the Court will apply Virginia law. An inquiry into the proper choice of law is only necessary if the relevant states' laws lead to conflicting results. *Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc.*, 2006 WL 5908727, at *11 (E.D. Va. Feb. 10, 2006).

13.)

The bald assertion that the plaintiff is "aware of no other reason why" these relationships ended does not establish a wrongful interference with a contractual expectancy. Rather, plaintiffs must objectively establish their reasonable expectation that the relationship would have resulted in economic benefits and that the defendant's actions precluded such realization. "[M]ere proof of a plaintiff's belief and hope that a business relationship will continue is inadequate to sustain the cause of action." *Commercial Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 301 (1997). Additionally, proof of future economic benefit must establish a *probability* of future economic benefit; the mere *possibility* of realizing such a benefit is insufficient. *Id.* The claim that VM is "aware of no other reason why" these relationships ended is simply insufficient for a successful tortious interference claim.

Furthermore, VM's claim that it is "aware of no other reason why" its relationship with Foxconn ended in February 2012—six to seven months after the communications between Hertensteiner and Foxconn ceased—is undercut by Copeland's admission to Hertensteiner on July 6, 2011 that "VME was dying" and that "Gilbert" would be discontinuing its products to VM. (Defs' Reply to Pl.'s Mot. Summ. J. Ex. E.) "Gilbert" is Gilbert Wu of both Foxconn and VME. Through sleight of hand, VM is attempting to argue that the end of its relationship with *Foxconn* was JAZ's fault, even though it already knew its relationship with *VME* (Foxconn's "shell" company) was quickly coming to an end. Copeland also said in his deposition that VM had no relationship with Foxconn other than the VME deal. (Copeland Deposition 10.) And Hertensteiner had earlier used his personal contacts to introduce Copeland to the Foxconn principals in the first place, so there is even less reason to think that VM and Foxconn would continue a partnership once JAZ was out of the picture. VM simply does not make the case that it was reasonable to expect its relationship with Foxconn to bloom once the VME deal fell

11

through in 2011. Moreover, VM offers absolutely no evidence of what this business expectancy was in concrete terms. Finally, VM totally ignores its own business and financial troubles, which Copeland details in his deposition, as a reason why companies might have avoided future transactions with VM.

Likewise, VM fails to show the existence of a business relationship with Office Maxx "with a probability of future economic benefit." *Id.* Copeland claims that VM "was in the process of establishing a customer relationship with Office Maxx," which included "lengthy discussions with Office Maxx about Office Maxx carrying Velocity Micro's products." (Pl.'s Mem. Supp. Summ. J., Ex. A ¶¶ 20–24.) And yet VM has failed to provide any evidence of these discussions or what agreement terms they had discussed. VM has produced only one email, between Jay Lerner, a JAZ sub-representative, (*Id.* ¶ 18.) and Kelli Pickering, who was apparently an Office Maxx representative. (*See id.*, Ex. I.) This email is not enough to show the existence of a business relationship or expectancy or the reasonable certainty thereof.

Moreover, Pickering's follow-up email to Copeland does not show that Lerner's one message to Pickering on July 12, 2011, caused the VM-Office Maxx deal to fall through. (*Id.*) If anything, Pickering's message, dated July 13, 2011, shows that she was aware of the "transition" away from JAZ and was pursuing further negotiations directly with Copeland. If the relationship did not ultimately materialize, it quite evidently had less to do with Lerner's communications and more to do with other factors.

Generally speaking, VM fails to attribute any injury to JAZ's alleged interference. The evidence makes clear that VM faced significant financial difficulties even prior to terminating its relationship with JAZ. Indeed, Copeland said he was "trying to find a way to save [his] company . . . when products stopped selling. . . ." (*See* Copeland Deposition 37–38.) This fact alone could explain why any relationship between VM and a retailer came to an end. And

without some evidence of a causal connection to JAZ's actions—other than Copeland's bald assertion—VM cannot claim that any harm to their relationships with Office Maxx and Foxconn was due to the defendants' actions. The Court shall accordingly grant the defendants summary judgment on VM's tortious interference claim.

### C. Defamation (Count II)

VM accuses the defendants of making various defamatory statements, specifically the following: (1) JAZ claimed that VM had defamed JAZ when VM notified third parties of their agreement termination; (2) JAZ claimed that VM had "unfairly" breached the terms of their agreement; (3) JAZ claimed that VM had tortiously interfered with JAZ's customer relationships by terminating the agreement; (4) Hertensteiner wrote in an email to Copeland and various Foxconn executives, "I am not the only person that believes your actions are worthy of litigation."; (5) Hertensteiner wrote in an email sent to representatives of the Douglas Stewart Company, a retailer, "Our team (JAZ and National Reps) have made it very clear that we would like to fix this mess. Our team together has also decided this week that we will not back down from a fight if need be."; and (6) Hertensteiner sent a number of angry text messages to Gilbert Wu between July 4 and July 13, 2011, including one in which he wrote, "[R]andy [Copeland] is broke and the whole industry knows it. . . ."

These statements do not support a defamation claim. All of these statements were either: (1) privileged statements in anticipation of litigation; (2) opinions; (3) neither demonstrably false nor negligently lacking in factual basis; or (4) private communications directly between the litigants.

A claim of defamation requires a showing that the defendant "published a false factual statement that concerns and harms the plaintiff or the plaintiff's reputation." *Hyland v. Raytheon Technical Servs. Co.*, 277 Va. 40, 46 (2009). Additionally, the plaintiff must also show that the

13

defendant knew the statement to be false, lacked a reasonable basis for believing its truth, or negligently failed to determine the statement's factual basis. *Id.* Statements that "impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment," are *per se* defamatory, regardless of whether such statements are direct or implicit. *Carwile v. Richmond Newspapers*, 196 Va. 1, 7 (1954). Nonetheless, relative, subjective statements are considered expressions of opinion and do not amount to actionable defamation. *Chaves v. Johnson*, 230 Va. 112, 119 (1985). The classification of a statement as opinion or fact is a legal determination for the court and does not present a question for the jury. *Id.*

### 1. Statements Made in the July 7, 2011 Letter from JAZ's Counsel

JAZ's Minnesota lawyer wrote that VM defamed and tortiously interfered with JAZ's customer relationships. He sent the correspondence to Copeland and three senior officials at VME (who are also affiliated with Foxconn). The letter says that the attorney represents JAZ and Hertensteiner and that "[t]his letter is your notice of claim and notice of intent to pursue litigation." (Pl.'s Mem. Supp. Summ. J., Ex. H.) An attorney's preliminary communications in proposed judicial proceedings are absolutely privileged and cannot serve as the basis of a defamation claim, insofar as such remarks relate to the contemplated litigation. *Mansfield v. Bernabei*, 727 S.E.2d 69, (Va. 2012). Thus, the defendants are not subject to suit on the basis of these statements.

This letter was not an instance of "communications tangentially related to potential litigation," *Mansfield*, 727 Va. at 74 (contrasting the case with *Lindeman v. Lesnick*, 604 S.E.2d. 55 (Va. 2004)), but rather falls squarely within the realm of "attempted settlement negotiations." The letter was unquestionably an attempt to put the controversy to rest. It states, "In the interest of avoiding litigation, my clients propose to restore their formerly amicable business relationship

14

with VME, and therefore make the following offer . . .", and then puts forth various conditions. (Pl.'s Mem. Supp. Summ. J., Ex. H.) To hold the defendants liable for this letter would clearly impinge on "the Commonwealth's long-expressed public policy preference of encouraging settlement." *Mansfield*, 727 Va. at 74. In short, any statements made in the attorney's letter are absolutely privileged, and summary judgment must be granted to the defendants for allegedly defamatory statements contained in this letter.

### 2. *VM's "Unfair" Actions*

VM next takes issue with JAZ's statement that VM "unfairly" breached the terms of the agreement. (Pl.'s Mot. Summ. J. 14.) Neither party cites where this statement appears on the record, and the Court is unable to locate it. Without any information as to the context of this statement—or proof that it was even "published" for the purposes of defamation—the plaintiff cannot be awarded summary judgment. Further, calling something "unfair" merely expresses an opinion, and is not actionable. For this reason alone, summary judgment must be awarded to the defendants.

### 3. *Actions "Worthy of Litigation"*

VM next claims that Hertensteiner committed defamation through the statement, "I am not the only person that believes your actions are worthy of litigation," which was communicated via e-mail to Copeland and other individuals at Velocity Micro, JAZ, and Foxconn. (Pl.'s Mot. Summ. J., Ex. G.) In other words, Hertensteiner was saying, I believe your actions are worthy of litigation—which is clearly an expression of opinion and thus protected—and that others agreed with this assessment. Only the latter part of this statement could therefore qualify as defamation, and the plaintiff has offered no proof that this statement was false. Without proof that a statement is false, there can be no defamation.

Moreover, the plaintiff mistakenly characterizes this statement *per se* defamation,

15

namely, an attack on VM's fitness for conducting business. This case is not, however, like the cases that the plaintiff cites in support of its argument. (*See* Pl.'s Mem. Supp. Summ. J. 15.) For one, this email does not make any specific allegation of wrongdoing, such as misappropriation of trade secrets or contract breach, which would implicate VM's credibility or trustworthiness. *Cf. Surgidev Corp. v. Eye Technology, Inc.*, 625 F. Supp. 800, 807 (D. Minn. 1986). Nor is it at all equivalent to a sweeping statement that a particular company is the type that "regularly breaches contracts." *Cf. Imperial Developers, Inc. v. Seaboard Sur. Co.*, 518 N.W.2d 623, 627 (Minn. App. 1994). It simply says VM's actions were "worthy of litigation," which does not call into question VM's ability to conduct business or trade in any tangible way. Thus, it is not *per se* defamation.

Beyond that, Hertensteiner made this statement within the context of private communications between Hertensteiner, VM, and VME/Foxconn. With the exception of a few other JAZ employees, all the recipients were people who received the original termination email. (*See* Pl.'s Mem. Supp. Summ. J., Exs. C–G.) The termination email resulted in a series of messages between Copeland and Hertensteiner, and the one in question is just the last one before the Court. VM again tries to play upon the formal separateness of VME and Foxconn as a way to say that its reputation was damaged within the business community. But, the three companies—VM, VME, and Foxconn—were intermeshed, linked by a business venture enterprise and overlapping management. Among these parties, no publication occurred. Rather, it was simply a communication among the principals of an enterprise.

### 4. "Not Back[ing] Down From a Fight"

VM cites the following statement made by Hertensteiner as defamatory: "Our team together has also decided this week collectively that we will not back down from a fight if need be." (Pl.'s Mot. Summ. J. Ex. J.) If anything, JAZ is communicating about its own character,

16

not VM's. The statement is not a defamation, let alone *per se* defamation.

### 5. "Broke and the Whole Industry Knows It"

Hertensteiner said that Copeland was "broke and the whole industry knows it." This claim fails because the plaintiff cannot show that the defendant knew the statement to be false, lacked a reasonable basis for believing its truth, or negligently failed to determine the statement's factual basis. *Hyland v. Raytheon Technical Servs. Co.*, 277 Va. 40, 46 (2009). Moreover, the statement is substantially true.

The entire text message at issue reads, "by the way randy is broke and the whole industry knows it including the Inventech . . . and all the Chinese suppliers . . . I spoke with today." (Dk. No. 59 at 3.) In other words, he was saying that his understanding was based partly on what he had heard from other parties. Thus, he clearly did not know it to be false, and it is hard to characterize this understanding as unreasonable or negligent given Copeland's testimony. When asked whether, in the first half of 2011, VM was in trouble, Copeland responded unequivocally, "Yes." (Copeland Deposition 37.) He added that he "was trying to find a way to save [his] company" because "products had stopped selling." (*Id.*) And clearly VME (i.e., Gilbert Wu and other Foxconn executives) thought there was a problem as well, because VME was "generally not happy with the sales." (*Id.* 14.)

For the foregoing reasons, the Court must grant summary judgment to the defendants on VM's defamation claim. None of VM's proffered bases for this claim hold up to scrutiny.

### D. Breach of Confidentiality (Count III)

VM next argues that the defendants breached their contractual duty of confidentiality through their July 19, 2011 email, of which at least some of the recipients were retailers. The parties were bound not to divulge information regarding "business connections . . . and other aspects of [their] business." VM argues that, by discussing in detail the relationship between

17

JAZ, VM, VME, and Foxconn, JAZ breached the confidentiality clause of the agreement. Even assuming a breach, the plaintiffs are not entitled to summary judgment due to their failure to show any injury. For this reason, the Court shall deny summary judgment to both parties and allow this claim to go forward to trial.

In Virginia, the elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff, (2) the defendant's violation or breach of that obligation, and (3) injury or damage to the plaintiff caused by the breach of obligation. *See Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004). Here, there is no question that the parties had a valid contract, so the only questions are whether the information disclosed was protected by the contract's confidentiality clause and whether VM can show that it was damaged by the impermissible disclosure. VM has shown not injury from the disclosure, and the damages are hardly self-evident.

Triable issues remain as to Count III, and the Court denies the parties' motions for summary judgment on that count.

### E. Trademark Infringement (Counts V & VI)

VM next brings claims of federal and common law trademark infringement due to the defendants' post-termination representations of a continued relationship with VM. The essence of a trademark claim, whether under statutory or common law, is that a competitor tries to use the plaintiff's trademark to benefit its own product sales or to capture the good will that the plaintiff has created. *See Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F 3d 789, 804 (4th Cir. 2001); *see also Sweetwater Brewing Co., LLC v. Great American Restaurants, Inc.*, 266 F. Supp. 2d 457, 460–61 (E.D. Va. 2003) (citing *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 n. 10 (4th Cir. 1995) (acknowledging that the test for federal trademark infringement and unfair competition in Virginia are essentially the same)).

The defendants have no competing mark or product to offer. At worst, at some point in the past they used the VM or CRUZ trademarks, not to sell their own competing product, but rather to sell more of VM's CRUZ tablets. Consequently, there is neither "similarity" of marks nor "similarity" of goods and services. Furthermore, the defendants' intent was clearly not to siphon business away from the plaintiff for their own benefit. Lastly, the plaintiff's proof of "actual confusion" is threadbare at best. *Cf. Sweetwater Brewing*, 266 F. Supp. 2d at 463 (listing the ways in which the two competing "Sweetwater Tavern" establishments were mixed up even by beer aficionados).

The cases cited by the plaintiff to support its argument are not on point, because each one of them involved parties that actually had competing goods or services to offer. Indeed, they only go to show why the plaintiff's claim should be rejected. *See Sweetwater Brewing*, 266 F. Supp. 2d 457 (involving the competing use of a mark entitled "Sweetwater Tavern" by two different brewery/restaurants); *Merry Maids Ltd. Partnership v. Kamara*, 33 F. Supp. 2d 443 (D. Md. 1998) (involving the continued use of the "Merry Maids" name by former franchisees for the benefit of their *own* cleaning service company even after their license had been terminated). Here, the defendants were trying to cling to their business relationship with the plaintiff. However misguided their effort may have been, it was not trademark infringement. Some retailers may have justifiably been confused about what was going on after the contract's termination. But their confusion was not the same as confusion about whose product was actually being marketed and sold, which is the relevant type of confusion for trademark infringement analysis.

In conclusion, summary judgment must be granted to the defendants on the trademark claims.

### F. Personal Liability for Hertensteiner

VM attempts to hold Hertensteiner personally liable for his actions under the defamation, tortious interference, and trademark infringement claims. Hertensteiner is clearly not a party to the contract between VN and JAZ, so the contract claims against him must be dismissed. Since the Court will be awarding summary judgment to the defendants on all the other claims, it is unnecessary to decide whether Hertensteiner is personally liable for any of the remaining claims.

### G. Permanent Injunctive Relief

The last issue is whether the plaintiff is entitled to an injunction preventing the defendants from saying and doing certain harmful things. VM has not prevailed on any of its own claims at this stage, so it cannot be awarded injunctive relief on them.

### IV. CONCLUSION

For the foregoing reasons, the Court shall (1) deny both motions for summary judgment with respect to VM's claim of overpayment of commissions; (2) deny the motions for summary judgment with respect to the defendants' counterclaim for unpaid commissions; (3) deny both motions for summary judgment with respect to VM's breach of confidentiality claim; (4) deny the plaintiff's motion and grant the defendants' motion with respect to the claims for tortious interference, defamation, and trademark infringement; and (5) deny the plaintiffs the injunctive relief requested. Both Hertensteiner and Copeland shall be dismissed from the action.

The Court shall enter an appropriate order.

Date: September 10, 2012
Richmond, VA

/s/ _____
John A. Gibney, Jr.
United States District Judge